IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


THOMAS WARNICK and          :
MAUREEN WARNICK,            :          CIVIL ACTION
                            :
            Plaintiffs,     :          NO. 05-2529
                            :
        v.                  :
                            :
THE HOME DEPOT U.S.A., INC.,  :
et al.,                     :
                            :
            Defendants.     :


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                        MAY 10, 2007


Plaintiff Thomas Warnick brings this negligence action
against Home Depot, U.S.A., Inc. and IBM Corp. for injuries
Warnick sustained when he fell through a ceiling at a Home Depot
store while installing computer network cables for an IBM
subcontractor.  Home Depot and IBM cross-claimed against each
other, and both now move for summary judgment against Warnick and
each other.


I.  BACKGROUND

    A.  Procedural Background

    On May 6, 2005, Warnick filed suit against Home Depot[1] in

_____

    [1] Warnick brought suit against "The Home Depot U.S.A., Inc.
(Headquarters)" and "The Home Depot U.S.A., Inc. (Branch)."

the Philadelphia County Court of Common Pleas.  On May 27, 2005,
Home Depot removed the case to this Court, on the basis of
diversity jurisdiction.  On August 9, 2005, Warnick filed an
amended complaint, adding IBM as a defendant and adding a count
on behalf of his wife, Maureen Warnick, for loss of consortium.
IBM and Home Depot then cross-claimed against each other.

Plaintiffs' pending counts are Count I (Thomas Warnick v.
Home Depot for negligence), Count II (Thomas Warnick v. IBM for
negligence), and Count IV (Maureen Warnick v. Home Depot and IBM
for loss of consortium).

IBM asserts one count against Home Depot, for contribution
if judgment is entered against it.

Home Depot asserts three counts against IBM.  Count I is for
contribution if judgment is entered against it, Count II is for
breach of contract for IBM's failure to defend Home Depot in this
litigation pursuant to their contract, and Count III is for
breach of contract for IBM's failure to adequately perform its
duties under their contract.


B.  Factual Background

The facts are actually quite simple, and for purposes of
these motions they are largely undisputed.  Home Depot and IBM

---

According to Home Depot, "Home Depot U.S.A., Inc." is the proper
defendant, because the company's corporate structure is not
legally separated between its headquarters and branch stores.

entered into a contract whereby IBM would provide computer installation, wiring, and networking products and services at several Home Depot stores, including the store in question in Landsdale, Pennsylvania.  IBM subcontracted some of its installation work to Datatec Systems, Inc.  Warnick was employed as an electrician by Datatec.[2]

On September 14, 2003, Warnick was installing computer network cables at the Home Depot store.  He was pulling cable through the ceiling of an office area while walking on a wooden plank in the ceiling.  He fell approximately fourteen feet, causing severe and permanent injuries.  He is no longer able to perform the duties he was performing at Datatec.

Warnick alleges, in short, that his fall was due to Home Depot's and/or IBM's negligence.  He contends that Defendants exercised approval and control over his performance of the work, that they failed to provide a safe work environment, and that they created a dangerous condition.

II.  DISCUSSION

---

[2] The parties' filings often misspell this name as "Datatech."  Presumably, Warnick did not bring a negligence claim against Datatec because Datatec, as Warnick's employer, is protected by Pennsylvania's Workers' Compensation Act, 77 Pa. Cons. Stat. §§ 1 et seq.  See Farabaugh v. Pa. Turnpike Comm'n, 911 A.2d 1264, 1266 n.1 (Pa. 2006).

A.   Summary Judgment Standard[3]

A court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is "material" if its existence or non-existence would affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue of fact is "genuine" when there is sufficient evidence from which a reasonable jury could find in favor of the non-moving party regarding the existence of that fact.  Id. at 248-49.  "In considering the evidence, the court should draw all reasonable inferences against the moving party."  El v. Se. Pa. Transp.

---

[3] Home Depot moved for summary judgment against Warnick and IBM (doc. no. 29).  IBM responded (doc. no. 31); Warnick responded (doc. no. 37).

IBM moved for summary judgment against Warnick (doc. no. 32).  Warnick responded (doc. no. 38).

IBM's response to Home Depot's motion for summary judgment, while not technically a motion for summary judgment, will be treated as one.  Indeed, IBM asks for "judgment in its favor." Therefore, the Court will treat the dispute between Home Depot and IBM as cross-motions for summary judgment.  See 10A Wright & Miller, Federal Practice & Procedure § 2270 ("The weight of authority . . . is that summary judgment may be rendered in favor of the opposing party even though the opponent has made no formal cross-motion under Rule 56. . . . [T]he practice of allowing summary judgment to be entered for the nonmoving party in the absence of a formal cross-motion is appropriate.").

<u>Auth.</u>, 479 F.3d 232, 238 (3d Cir. 2007).  "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  <u>Berckeley Inv. Group, Ltd. v. Colkitt</u>, 455 F.3d 195, 201 (3d Cir. 2006).

    B.  <u>Application of the Summary Judgment Standard</u>

        1.  <u>The negligence claims against Home Depot and IBM</u>

Under Pennsylvania law,[4] a claim for negligence requires four elements:

> (1) a duty or obligation recognized by the law, requiring the actor to conform to a certain standard of conduct for the protection of others against unreasonable risks; (2) a failure to conform to the standard required; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting in harm to the interests of another.

<u>Nw. Mut. Life Ins. Co. v. Babayan</u>, 430 F.3d 121, 139 (3d Cir. 2005) (applying Pennsylvania law).  In other words, a plaintiff must show the usual (1) duty, (2) breach, (3) causation, and (4) damages.  <u>See</u> <u>Farabaugh v. Pa. Turnpike Comm'n</u>, 911 A.2d 1264, 1272-73 (Pa. 2006).  "Whether a defendant owes a duty to a plaintiff is a question of law."  <u>In re TMI</u>, 67 F.3d 1103, 1117 (3d Cir. 1995).

---

[4] In this diversity action, Warnick's negligence claims are governed by Pennsylvania law.

Warnick has two potential bases of liability against Home Depot and one against IBM.  As to Home Depot, Warnick argues that Home Depot, as a landowner, owes a duty to those who perform work on its premises.  As to both Home Depot and IBM, Warnick argues that, as parties who hired contractors for the performance of certain work, they owe a duty to the employees of those contractors.

Home Depot did not, under either theory, owe Warnick any duty.  Home Depot is therefore entitled to summary judgment on Warnick's negligence claim against it.

Likewise, IBM did not owe Warnick a duty.  IBM is therefore entitled to summary judgment on Warnick's negligence claim against it.

> a.   Warnick's negligence claim against Home
>
> Depot

First, Warnick argues that Home Depot owed Warnick a duty because of Home Depot's position as a landowner.[5]  The general rule is that a possessor of land owes a duty to business invitees, such as employees of independent contractors, where a non-obvious dangerous condition exists on the possessor's land.

---

[5] The Pennsylvania Supreme Court's recent decision in Farabaugh v. Pennsylvania Turnpike Commission, 911 A.2d 1264, 1270 (Pa. 2006), presents a helpful guide for analyzing a contractor's employee's negligence action against the landowner under the relevant Restatement (Second) of Torts sections.

See Restatement (Second) of Torts § 343 (Dangerous Conditions
Known or Discoverable By Possessor).  For the duty to attach, the
condition must be non-obvious.  In addition, there is no duty if
the contractor is in the same position as the landowner to
discover the dangerous condition or if the contractor is the
party that created the dangerous condition in the first place.

The second asserted duty is premised on Home Depot's alleged
liability as a party who contracts for certain work to be
performed.  Under the general rule, a hiring party is not liable
for the injuries of an independent contractor's employees.
However, there are two exceptions to this rule.  The first
exception is for "retained control": the hiring party owes a duty
to the contractor's employees if the hiring party retains control
over the means and methods of the contractor's work.  See
Restatement (Second) of Torts § 414 (Negligence in Exercising
Control Retained By Employer).  The second exception is for
"peculiar risks": a hiring party owes a duty to the contractor's
employees if the work being performed poses a special danger or
is particularly risky.  See Restatement (Second) of Torts § 416
(Work Dangerous in the Absence of Special Precautions) and § 427
(Negligence as to Danger Inherent in the Work).

I.   Duty as landowner (Section 343)

The parties agree that Warnick was a business invitee on

Home Depot's premises.   See Gutteridge v. A.P. Green Servs., Inc., 804 A.2d 643, 655 (Pa. Super. Ct. 2002) ("Employees of independent contractors . . . are 'invitees' who fall within the classification of 'business visitors.'").   Pennsylvania has adopted the Restatement (Second) of Torts § 343's standard for when a landowner owes (and breaches) its duty to an invitee:

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
>
> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>
> (c) fails to exercise reasonable care to protect them against the danger.

Restatement (Second) of Torts § 343; see Carrender v. Fitterer, 469 A.2d 120, 123 (Pa. 1983) (adopting Restatement (Second) of Torts § 343).   This is a narrow theory of liability:

> Pennsylvania law imposes no general duty on property owners to prepare and maintain a safe building for the benefit of a contractor's employees who are working on that building.   Rather, our law generally insulates property owners from liability for the negligence of independent contractors and places responsibility for the protection of the contractor's employees on the contractor and the employees themselves.

Gutteridge, 804 A.2d at 656 (citing Mentzer v. Ognibene, 597 A.2d 604, 608-09 (Pa. Super. Ct. 1991)).

The landowner does not owe a duty to the contractor's

employee if the defective conditions of the land are the products of the contractor's work.  <u>Farabaugh</u>, 911 A.2d at 1273 (quoting <u>Crane v. I.T.E. Circuit Breaker Co.</u>, 278 A.2d 362, 364 (Pa. 1971).  In addition, the landowner "has no duty to warn the contractor or his employees of a condition that is at least as obvious to [the contractor and his employees] as it is to [the landowner]."  <u>Colloi v. Phila. Elec. Co.</u>, 481 A.2d 616, 620 (Pa. Super. Ct. 1984) (citing <u>Repyneck v. Tarantino</u>, 202 A.2d 105 (Pa. 1964)).

Here, Warnick argues that there is a dispute as to who actually placed the board on top of the office.  But this issue of fact is not "genuine."  Whether the board placed on the ceiling high above the ground was placed by Home Depot or Datatec (or another party), this dangerous condition of land was at least as obvious to Warnick and Datatec as it was to Home Depot. Indeed, Andrew Orr, Datatec's foreman on the job, testified that he saw the board on the ceiling above the office before Warnick walked on it (although Orr first saw the board the night of the accident).  Doc. No. 29, Ex. L, Andrew Orr depo., at 83.  Warnick testified that he saw a co-worker, Al Bauer, put at least one foot on the board.  Doc. No. 29, Ex. K, Plaintiff depo., at 70-73.  And Bauer testified that he had used the board earlier that night or the previous night.  Doc. No. 29, Ex. N, at 17. Finally, Section 343 applies only to "non-obvious" conditions; an

unsecured board resting high above the ground is obvious.
Therefore, Home Depot had no duty to warn Warnick of the board's
dangerousness; Datatec and/or Warnick knew or should have known
of the condition themselves.

Therefore, Home Depot did not owe Warnick the duty to warn
of non-obvious dangerous conditions that a landowner
traditionally owes a business invitee.

ii.  Duty as employer of contractor
(Sections 414, 416, and 427)

The general rule is that a party that hires a general
contractor is exempt from liability for injuries sustained by the
contractor's employees.  Farabaugh, 911 A.2d at 1273; see also
Restatement (Second) of Torts § 409 ("[T]he employer of an
independent contractor is not liable for physical harm caused to
another by an act or omission of the contractor or his
servants.").

> An owner of land who delivers temporary possession of a
> portion of the land to an independent contractor owes
> no duty to the employees of the independent contractor
> with respect to an obviously dangerous condition on
> that portion of the land in the possession of the
> contractor.

Hader v. Coplay Cement Mfg. Co., 189 A.2d 271, 277 (Pa. 1963).
The two relevant exceptions to this rule are (1) if the hiring
party exercised "control over the means and methods of the
contractor's work" and (2) if the work being performed poses a

10

special danger or is particularly risky.  <u>Farabaugh</u>, 911 A.2d at 1273, 1276.

(1)  The "retained control" exception

The "retained control" exception applies if the hiring party retains control over the methods and means of the contractor's work.  <u>See</u> <u>Restatement (Second) of Torts</u> § 414 (imposing a duty of reasonable care to a contractor's employees on "[o]ne who entrusts work to an independent contractor, but who retains the control of any part of the work").  The contours of the exception are explained in the comment to the Restatement:

> In order for the ["retained control" exception] to apply, the employer must have retained at least some degree of control over the manner in which the work is done.  It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.

<u>Restatement (Second) of Torts</u> § 414, cmt. c; <u>see also</u> <u>LaChance v.</u> <u>Michael Baker Corp.</u>, 869 A.2d 1054, 1058-59 (Pa. Commw. Ct. 2005) (discussing the comment).  There is no question here that Home Depot had no involvement in how Datatec (the contractor and Warnick's employer) performed its work.

A long line of Pennsylvania cases has construed this exception narrowly, almost always finding that the hiring party did not exercise sufficient control over the contractor to impose liability on the hiring party for the contractor's employee's injury.  In Hader, although the hiring party's plant manager and vice president frequently visited the construction site, they did not give "any instructions as to the manner of installation" of the machinery at issue, and therefore "their presence was completely innocuous."  189 A.2d at 278.  In Emery v. Leavesly McCollum, although the hiring party employed a "site manager" to monitor the contractor's work, he merely "acted as a liaison between the owner and the contractor.  His responsibility was to make sure that the contractor was complying with the contract."  725 A.2d 807, 813-14 (Pa. Super. Ct. 1999).  And in Farabaugh, the court again found the "retained control" exception inapplicable, even though the hiring party required the contractor's employees to watch a safety video, included safety provisions in its contract with the contractor, and hired a separate contractor "specifically to supervise safety issues."  911 A.2d at 1275.

The Pennsylvania Commonwealth Court's opinion in LaChance provides a good example.  The landowner hired a contractor to improve a portion of a state road.  869 A.2d at 1055.  The project entailed, inter alia, laying large underground pipes.

Id.  While the plaintiff, an employee of the contractor's, was
grouting the inside of a pipe, the trench surrounding the pipe
collapsed, and the employee was killed.  Id.  The employee argued
that the owner was liable under the "retained control" exception,
both because of certain contract provisions and the owner's
course of conduct.  Id. at 1057.  The court rejected both
arguments.  Id. at 1062.  Certain contract provisions discussing
the owner's rights and duties did not make the owner liable:
"[The owner's] inspection rights, exercised to assure itself that
[the contractor] performed its work safely, as [the contractor]
had agreed in its contract, did not make [the owner] the
guarantor of the safety of [the contractor's] employees. . . .
[The contractor's] contract performance had to meet [the owner's]
contract specifications, but [the contractor] controlled the
manner of performance.  This is how contractual relationships
work."  Id. at 1060-61.  The court also held that the owner's
actual conduct did not evidence its control.  Id. at 1062.  The
owner's field inspector allegedly directed the contractor's
employees to grout outside of the pipe in question instead of
inside the pipe.  Id. at 1061.  The court held that simply
directing an employee to undertake a discrete activity did not
rise to the level of retention of control over the

subcontractor's work.[6]  Id. at 1062.  Therefore, the owner did not "retain control" over the worksite sufficient to impose liability; the contractor was both contractually responsible for the safety of its employees and actually responsible for the accident that caused the plaintiff's death.

Warnick attempts to support his argument with Byrd v. Merwin, 317 A.2d 280 (Pa. 1974), but Byrd is factually distinguishable.  In Byrd, a subcontractor's employee was injured when a prefabricated staircase fell on his leg, and he brought an action against the landowner.  Id. at 281.  The owner, not the general contractor, had hired and paid the subcontractors.  Id. at 282.  In addition, the owner had instructed the subcontractor when and where to work.  Id.  Finally, the general contractor himself testified that the owner, not the general contractor, was in control of the project.  Id.

Warnick argues that the actions of Mark Brosious, Home Depot's assistant manager, evidence that Home Depot retained control of the Datatec worker's safety.  Brosious testified that he would tell Datatec employees to stop engaging in certain activities if Brosious thought they were unsafe.  See Doc. No.

---

[6] The court also seemed to base its decision on the fact that the owner's directive to the contractor's employee to grout the outside of the pipe did not cause the accident; the accident was caused by the "digging, benching, bracing or shoring" of the trench, over which the contractor had complete responsibility and absolute discretion.  Id. at 1062.

37, Ex. G, at 73-74 (Brosious Depo.: "If people or contractors were in racks, were standing in racks or on top of pallets, I would request that, you know, they would come down or have us move the pallets that they needed removed."). Even if Brosious did "instruct" Datatec employees on safety issues, as Warnick alleges, such instruction is insufficient to meet the "retained control" exception. The owner's safety-related actions in Farabaugh--requiring the contractor's employees to watch a safety video and hiring a separate contractor "specifically to supervise safety issues," 911 A.2d at 1275--are more pervasive than here, and yet the court in Farabaugh concluded that the owner did not "retain control" over the contractor's employees' work. Warnick has not alleged that Home Depot instructed Datatec employees on how to install the network cables or to walk on boards in the ceiling in the course of their work. Therefore, Home Depot did not "retain control" over the methods of Datatec's and Warnick's work.

                              (2)  The "peculiar risk"

                                   exception

    The "peculiar risk" exception[7] applies if the work to be

_____

    [7] The "superior knowledge doctrine" (Section 416) and the "peculiar risk doctrine" (Section 427) are "basically interchangeable and overlapping concepts." Lorah v. Luppold Roofing Co., Inc., 622 A.2d 1383, 1385 n.1 (Pa. Super. Ct. 1993).

15

done by the independent contractor involves a special or peculiar risk.  A special danger or peculiar risk exists where (1) "the risk is foreseeable to the owner at the time the contract is executed" and (2) "the risk is different from the usual and ordinary risk associated with the general type of work done." Farabaugh, 911 A.2d at 1277 (quoting Emery, 725 A.2d at 814). "All construction work involves a risk of some harm; only where the work is done under unusually dangerous circumstances does it involve a 'special danger' or 'peculiar risk.'" Ortiz v. Ra-El Dev. Corp., 528 A.2d 1355, 1359 (Pa. Super. Ct. 1987).  "In order for the liability concepts involving contractors to retain any meaning, especially in industries such as construction where almost every job task involves the potential for injury unless ordinary care is exercised, peculiar risk situations should be viewed narrowly, as any other exception to a general rule is usually viewed." Marshall v. Se. Pa. Transp. Auth., 587 F. Supp. 258, 264 (E.D. Pa. 1984).

In most of the cases in which the plaintiff unavailingly points to the "peculiar risk" doctrine, the employee was performing routine construction work without the proper safety precautions when he injured himself.  Courts have declined to apply the doctrine to this factual scenario; for the doctrine to apply, the employee must have been performing work that entailed risks different from the ordinary risks associated with the

16

employee's usual work.  Violations of safety conditions--whether
by the employee or his employer, the contractor--are not a basis
for invoking the doctrine.  Lorah v. Luppold Roofing Co., Inc.,
622 A.2d 1383, 1386 (Pa. Super. Ct. 1993).

For instance, in Lorah, the employee was walking down a
ladder when the ladder moved off the wall.  Id.  Walking down a
ladder into a construction pit while carrying about twenty-five
pounds of rebars was not itself a "peculiar risk"; rather, the
worker's (or his employer's) failure to properly secure the
ladder was what created the risk.  Id.  "What made the activity
of increased risk was not the activity itself, which is normally
of minimal risk, but the failure of the independent contractor
(and/or his servants) to take adequate precautions."  Id.  In
other words, the activity itself must be of increased risk; the
manner in which the worker engages in that activity is not
relevant.

Here, the work that Warnick was performing was not
particularly risky; he was installing computer network cables.
The manner in which he was installing the cables, walking on
boards in the ceiling and swinging the cables through, was not
itself particularly risky.  What made the endeavor risky was
Warnick's failure to secure himself with a lanyard and/or
Datatec's failure to properly secure the boards upon which
Warnick was walking.  In short, the activity would not have been

17

risky had Warnick and Datatec--the parties most able to provide for Warnick's safety--properly provided for Warnick's safety while installing in the cables.

Therefore, the "peculiar risk" doctrine does not apply.

iii.  Conclusion: Home Depot owed no
          duty to Warnick

The general rule is that Home Depot, the landowner and hiring party, is not liable for the injuries of its contractors' employees.  As a landowner, Home Depot owed no duty to Warnick because Datatec was at least as aware of the dangerous condition as was Home Depot.  As the hiring party, Home Depot owed no duty to Warnick because Home Depot did not "retain control" of the means of Warnick's work and the work to be done was not of a particularly risky nature.  Therefore, there is no genuine issue of material fact as to whether Home Depot was at least aware of the condition as was Datatec; as to whether Home Depot "retained control" over the worksite; or as to whether the job Warnick was performing was particularly risky.  As a matter of law, Home Depot did not owe Warnick a duty.  Home Depot is entitled to summary judgment on Warnick's negligence claim.

b.  Warnick's negligence claim against IBM

As noted above, the general rule is that the party that

18

hires an independent contractor is <u>not</u> liable for injuries of the contractor's employees.  <u>See</u> <u>Restatement (Second) of Torts</u> § 409 ("[T]he employer of an independent contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servants.").  Therefore, the starting proposition is that IBM, as the general contractor on the project, did not owe a duty to employees of Datatec, the subcontractor.  However, as with Home Depot, IBM can be liable for Warnick's injuries if IBM can be said to have "retained control" over the means and methods of Datatec's work.  <u>See</u> <u>Restatement (Second) of Torts</u> § 414 ("One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.").  Thus, the question is whether IBM "retained control" of any part of the work it delegated to Datatec.

In <u>Leonard v. Commonwealth</u>, 771 A.2d 1238 (Pa. 2001), the Pennsylvania Supreme Court analyzed a general contractor's liability when it has delegated work to a subcontractor.[8]  In

---

[8] Curiously, <u>Leonard</u> did not explicitly cite <u>Restatement (Second) of Torts</u> § 414, even though the factual scenario in <u>Leonard</u>--a subcontractor's injured employee suing the general contractor--is explicitly discussed in Section 414 and the comments thereto.  Nevertheless, <u>Leonard</u> and <u>Hader v. Coplay Cement Mfg. Co.</u>, 189 A.2d 271 (Pa. 1963), stand in the same line of cases, and <u>Hader</u>'s progeny (<u>Hader</u> was decided in 1963, while

<u>Leonard</u>, PennDOT entered into a contract with Kiewitt/Perini, a general contractor, to improve a portion of an interstate highway by, inter alia, demolishing and rebuilding certain bridges.  <u>Id.</u> at 1239.  Kiewitt/Perini entered into a contract with High Steel, a subcontractor, to fabricate and erect steel for the bridges.  <u>Id.</u>  High Steel, in turn, entered into a contract with Cornell, a sub-subcontractor, to erect the steel.  <u>Id.</u>  Leonard, the plaintiff, was an employee of Cornell's.  <u>Id.</u>  Leonard, who was wearing a safety belt that was not attached to any safety device, fell about forty feet, sustaining serious injuries.  <u>Id.</u>

The court first noted the "established law" that "a contractor is not liable for injuries resulting from work entrusted to a subcontractor."  <u>Id.</u> at 1240.  An injured worker can recover only from that subcontractor that was directly in control of the worker's pursuit.  <u>Id.</u>  Pennsylvania has adopted <u>Restatement (Second) of Torts</u> § 384, comment d:

> A possessor of land may put a number of persons severally in charge of the particular portions of the work of erecting a structure or creating any other

---

the <u>Restatement (Second) of Torts</u> was promulgated in 1965) explicitly incorporate Section 414.  <u>See, e.g.</u>, <u>Celender v. Allegheny County Sanitary Auth.</u>, 222 A.2d 461, 463-64 (Pa. Super. Ct. 1966) (discussing <u>Hader</u> in connection with Section 414).  As the <u>Farabaugh</u> court put it, "[t]hese cases consider whether and to what extent the owner [<u>see</u> <u>Hader</u>] or general contractor [<u>see</u> <u>Leonard</u>] has delegated responsibility for the work on the property to a subcontractor."  911 A.2d at 1281.  There is thus no appreciable difference in the "retained control" analysis between a subcontractor's employee's negligence action against a landowner and one against a general contractor.

condition upon the land.  Again, a general contractor
employed to do the whole of the work may, by the
authority of his employer, sublet particular parts of
the work to subcontractors.  In such a case, <u>the rule
stated in this Section applies to subject the
particular contractor or subcontractor to liability for
only such harm as is done by the particular work
entrusted to him</u>. . . .

<u>Restatement (Second) of Torts</u> § 384, cmt. d (emphasis added).

Under this formulation, only Cornell, Leonard's direct

employer, would be liable for Leonard's injuries.  771 A.2d at

1241.  The court rejected Leonard's attempt to impose liability

on Kiewitt/Perini (the general contractor) or High Steel (the

subcontractor) for their alleged failure to comply with

applicable Occupational Safety and Health Administration (OSHA)

regulations governing site safety.  <u>Id.</u> at 1241.  "The fact that

OSHA requirements were applicable to the project does not . . .

mean that Kiewit/Perini or High Steel had a presence at the site

or control over the work done by Cornell.  Absent those elements,

liability does not attach."  <u>Id.</u>

The court also rejected Leonard's attempt to impose

liability on Kiewitt/Perini or High Steel based on certain

language in the contract between them and between Kiewitt/Perini

and PennDOT.  <u>Id.</u> at 1242.  The court held that Cornell's

contract to erect the steel assumed all of Kiewitt/Perini's

and/or High Steel's responsibilities for safety compliance.  <u>Id.</u>

The responsibility for the safety of a particular project can

(and should) be delegated to the subcontractor that is to

actually perform that particular work.  Id.  "Logically, safety
responsibility best rests on the subcontractor doing the work,
for that party is most familiar with the work and its particular
hazards."  Id.

Leonard establishes that IBM, the general contractor, could
delegate all of its responsibilities to Datatec, the
subcontractor, in which case IBM would not owe a duty to Warnick
and Warnick's negligence claim against IBM would fail.  The
question here is whether IBM did in fact delegate all of its
responsibilities to Datatec.

It is undisputed that IBM was not physically "present" at
the Home Depot store on the day of the accident, nor had IBM been
"present" there for about nine months.  See Doc. No. 29, Ex. O,
at 77 (Richard Clark, Home Depot corporate designee, depo.:
"[T]here was no need to have [IBM] on site representation [after
December 2002].").  Plaintiff concedes this point.  Doc. No. 38,
¶ 3.  Warnick argues that IBM was in control of Datatec's
responsibilities even though it was not physically present at the
Home Depot store.  While as a matter of law this proposition
might be true--a general contractor can "retain control" over a
subcontractor in spite of the general contractor's lack of
physical presence, see Young v. Commercial Group, Inc., 2005 WL
591199, at *5 (E.D. Pa. Mar. 8, 2005)--a general contractor's
absence from the worksite certainly militates in favor of finding

that the contractor did not "retain control."

Warnick asserts two nonexclusive theories for why IBM "retained control" over the worksite.  The first is based on the contract between IBM and Datatec: that IBM did not delegate <u>all</u> of its responsibilities to Datatec.  The second is based on IBM's course of conduct: that IBM actually exercised control over Datatec and its employees.

The contracts between IBM and Datatec merely retained for IBM supervisory and inspection power; IBM was not in "control" of the worksite.  "The purpose of [Section 414] is to insulate from liability those employers who retain only the general right of inspection and supervision and not control over the conduct of the work."  <u>Pettyjohn v. Goodyear Tire & Rubber Co.</u>, 1992 WL 203390, at *5 (E.D. Pa. Aug. 14, 1992).[9]

The Pennsylvania Commonwealth Court observed in <u>LaChance</u> that "[w]hile the general contractor's retained control may be less than that of a master over a servant, mere supervision over the work of a subcontractor, up to and including the right to stop a project, is not control sufficient to impose liability."

---

[9] The court in <u>Pettyjohn</u> denied the defendant summary judgment, because it was unclear whether the defendant was permitted to correct only "general, unsafe activity," in which case there would be insufficient "control," or whether the defendant was permitted to "specifically correct the manner in which the work was being performed," in which case the defendant would have "retained control" sufficient to impose liability. <u>Id.</u> at *5.

869 A.2d at 1058.[10]   In <u>LaChance</u>, in the contract between PennDOT (the landowner) and Baker (the contractor and the plaintiff's employer), Baker expressly assumed "responsibility for project safety through compliance 'at all times with applicable Federal, State, and local laws, provisions, and policies governing safety and health.'"   <u>Id.</u> at 1059-60 (quoting the contract).   In addition, Baker agreed to "[k]eep direct control of the contract and see that the work is properly supervised and is performed satisfactorily and efficiently" and also "[s]upervise the work personally or appoint a competent superintendent or representative to be on the project at all times."   <u>Id.</u> at 1060 (quoting the contract).   The contract gave PennDOT a broad right

_____

[10] This proposition stems from comment b to Section 414:

The rule stated in this Section is usually, though not exclusively, applicable when a principal contractor entrusts a part of the work to subcontractors, but himself or through a foreman superintends the entire job.  In such a situation, the principal contractor is subject to liability if he fails to prevent the subcontractors from doing even the details of the work in a way unreasonably dangerous to others, if he knows or by the exercise of reasonable care should know that the subcontractors' work is being so done, and has the opportunity to prevent it by exercising the power of control which he has retained in himself.  So too, he is subject to liability if he knows or should know that the subcontractors have carelessly done their work in such a way as to create a dangerous condition, and fails to exercise reasonable care either to remedy it himself or by the exercise of his control cause the subcontractor to do so.

<u>Restatement (Second) of Torts</u> § 414, cmt. b.

of inspection and the right to stop work and provided that PennDOT's "inspection staff will continuously monitor safety on a routine basis." Id. (quoting the contract). "PennDOT's inspection rights, exercised to assure itself that Baker performed its work safely, as Baker had agreed in its contract, did not make PennDOT the guarantor of the safety of Baker's employees." Id. at 1060-61.

Similarly, in White v. Chevron, U.S.A., Inc., 1994 WL 285028, at *2 (E.D. Pa. June 27, 1994), the contract stated: "[the contractor's] work will be performed under the direction of, and coordinated by the appropriate [landowner] representative." This contract language indicated that "[r]ather than controlling the work performed, [the landowner] was merely to direct and coordinate." Id. (emphasis in original). The court also held that the contract provision that "all contractor's Maintenance personnel will be available to work under the supervision of [the landowner's] supervisor" merely established the landowner's supervisory role, which does not "rise to the level of operative control." Id. at *3.

Young v. Commercial Group, Inc., 2005 WL 591199 (E.D. Pa. Mar. 8, 2005), is illustrative of the absence of an express delegation of duties to the subcontractor. In Young, a subcontractor's employee was injured while working at a Home Depot store. Id. at *1. Home Depot had hired Milric, a general

contractor, which in turn had hired two subcontractors, L.G.B. and Commercial Group.  Id.  Young, the plaintiff, was employed by L.G.B.  Id.  The court denied Milric's motion for summary judgment, because "there was no clear delegation [to either subcontractor] of the duty to provide safety precautions and to supervise the work being performed."  Id. at *6.  At the time of the accident, Milric and Commercial Group were operating under an oral contract, which did not address the scope of Milric's delegation, if at all, of any duties to Commercial Group.  Id.

Here, IBM points to contract language that it delegated all project management responsibilities (including safety) to Datatec.  One of the contracts between IBM and Datatec (the Cabling Services--Statement of Work (SOW), Doc. No. 38, Ex. E) provides that "[t]he Supplier [Datatec] will provide on-site project management."  SOW ¶ 8.  Another contract (the Master Procurement Agreement (MPA), Doc. No. 29, Ex. I), provides that Datatec will "be responsible for the supervision, control, compensation, withholdings, health and safety of Supplier Personnel" and "ensure Supplier Personnel performing services on Buyer's premises comply with On Premises Guidelines."  MPA § 11.0.  And still a third contract (the Design-Build Services Attachment (DBSA) to the IBM Master Procurement Agreement and Customer Solutions Procurement Agreement, Doc. No. 29, Ex. I), provides that Datatec "will maintain a safety and health program

26

at the job site, and take all necessary precautions to protect the Work, all individuals on premises, the public, and adjacent property." DBSA at 4.

However, Datatec points to contract language that IBM retained certain responsibilities. The SOW provides that "IBM has the right to review, approve and request removal of Supplier personnel and/or your subcontractor personnel on any project in support of [this agreement]." SOW ¶ 4. The SOW also details the responsibilities of the Datatec project manager vis-a-vis the IBM project manager (allegedly evidencing IBM's involvement in the project):

> The Supplier [Datatec] will appoint a Project Manager (supervisor) who will have explicit responsibility for the administration and technical direction of Subcontractor's activities.
>
> Project Manager duties include:
>
> With the IBM Project Manager, discuss the SOW, and Change Control Procedure documented in this Cabling Services--SOW, and review the responsibilities of all parties.
>
> Provide orientation for new project team members.
>
> Establish and administer project leadership procedures and develop project work plans in coordination with the IBM Project Manager.
>
> Measure and evaluate project progress against established work plans and schedules.
>
> Estimate tasks in hours, and on a weekly basis (or as agreed to with the IBM Project Manager) report task progress in actual hours worked and estimate hours to complete, as required by the IBM Project Manager.

> Provide, as required by the IBM Project Manager,
> written progress reports to the IBM Project Manager.
>
> Administer the Change Control Procedure with the IBM
> Project Manager.

SOW § V.

In short, under the contracts, (1) IBM had the right to
approve and remove Datatec's personnel and (2) IBM's project
manager had general coordination responsibilities and inspection
rights.  As explained in <u>LaChance</u> and <u>White</u>, such general duties
under a contract to supervise the subcontractor and monitor its
work do not make the general contractor liable under Section
414's "retained control" exception.  "[The owner's] inspection
rights, exercised to assure itself that [the contractor]
performed its work safely, as [the contractor] had agreed in its
contract, did not make [the owner] the guarantor of the safety of
[the contractor's] employees. . . . [The contractor's] contract
performance had to meet [the owner's] contract specifications,
but [the contractor] controlled the manner of performance.  This
is how contractual relationships work."  869 A.2d at 1060-61.
Therefore, under the contracts, IBM did delegate all of its
"control" to Datatec and thus did not owe Warnick any duty.

Warnick also argues that IBM's course of conduct shows that
it "retained control."  In support, Warnick points to the
deposition testimony of Gary Correll, IBM's corporate designee
and the project executive on the Home Depot account.  Gary

Collis, one of the five IBM project managers that reported to
Correll, was the project manager "who was responsible for the
Datatec relationship and dealt on the day-to-day activities with
Datatec's project manager, Jay Claman."  Doc. No. 29, Ex. P, at
101-02 (Gary Correll depo.).  Correll testified that Collis was
responsible for coordinating with Datatec, including on any
safety issues that Datatec might have.  Id. at 105-06.  When
asked, "Would there be anyone who did have day-to-day interaction
with this project that would be able to tell me whether IBM had
any safety duties," Correll responded, "That would be me as
project team over there.  And I would contend that we did have a
responsibility when safety violations were brought to our
attention to deal with those safety requirements at that
particular time."  Id. at 114.

Correll testified that he knew of two instances in which
Datatec workers at Home Depot stores had safety-related issues:

> One was using -- the Datatec crew had used a Home
> Depot forklift to gain access to the ceiling for
> running some cables, which was not something that Home
> Depot wanted or IBM wanted.
>
> They were supposed to use a scissor lift.  The
> other one was a Datatec employee had gotten injured in
> one of the roll-up doors on the back of the Home Depot
> building.  Those were reported to us.
>
> [The incident about the scissor lift] was
> communicated through Home Depot directly to IBM.

Id. at 106-07.[11]

These statements by Correll are not evidence that IBM "retained control" over the means that Datatec performed its work.  Correll expressed concern for the safety of Datatec's workers; concern is not control.  In Farabaugh, the hiring party went so far as to hire another contractor specifically to ensure that other contractors were complying with applicable safety regulations.  911 A.2d at 1275.  The court held that the hiring of this "safety contractor" did not mean that the hiring party "retained control" over the performance of the other contractors' work; rather, it was a prudent maneuver to try to minimize workers' injuries.  Correll's statements are thus tantamount to the "safety contractor's" role in Farabaugh to ensure that other contractors were complying with applicable safety regulations.  That a hiring party had someone monitor safety issues at the worksite does not mean that the hiring party "retained control" over worksite safety.

IBM was not at the worksite; IBM did not tell Datatec how to do its job.  When IBM was notified that Datatec workers might be working in an unsafe manner, it expressed its concern to Datatec.  Indeed, Correll thought that IBM had a "responsibility" to do so.

---

[11] At the deposition, counsel for IBM objected to this line of questioning.  Correll could not identify which Home Depot store(s) had these problems.  Drawing inferences in favor of Plaintiff, it is possible that IBM had notice of these safety issues at the store in question.

But IBM's actions did not constitute "control" over the way that Datatec performed its work.[12]

The contract language gives IBM the power only to coordinate and inspect Datatec's work.  There is nothing in the contract that differs from the contract language from other cases in which courts have held that the general contractor delegated its responsibilities (and hence, "control") to the subcontractor.  In addition, IBM's course of conduct, even when viewed in the light most favorable to Warnick, shows that IBM did not have control over how Datatec employees performed their jobs.

---

[12] Bullman v. Giuntoli, 761 A.2d 566 (Pa. Super. Ct. 2000), is not helpful to Plaintiff's case.  In Bullman, the Pennsylvania Superior Court held that a landowner did "retain control" over his home construction site, in spite of his hiring of a general contractor.  Id. at 578.  The homeowner visited the site daily and frequently consulted with the general contractor and changed the specifications for the construction.  Id.  However, one factor weighed heavily on the court's totality of the circumstances analysis: that the homeowner had notice from other individuals, including his wife and certain subcontractors, about the potentially dangerous condition, and yet took no action.  Id. This factor did not go to whether the homeowner owed a duty to the visitor; rather, that the homeowner had notice went to the issue of whether the homeowner breached his duty to the visitor. In other words, the court improperly conflated the two elements (duty and breach) of the negligence claim in its analysis.

Note that Bullman produced a vigorous dissent that argued that the majority incorrectly reached the "retained control" issue.  Id. at 579 (Johnson, J., concurring and dissenting).  As explained in the dissent, the lower court never decided whether the homeowner "retained control," and that issue was not briefed to the Superior Court.  Id.  The majority, after reversing the lower court's grant of summary judgment on the assumption of risk doctrine, volunteered that summary judgment was inappropriate because the homeowner had "retained control."

31

Therefore, there is no issue of material fact as to whether IBM "retained control" over Datatec.  If IBM did not retain control, then, as a matter of law, IBM did not owe Warnick a duty of reasonable care.  IBM is entitled to summary judgment on Warnick's negligence claim against it.

### c.  Policy considerations

While under the applicable law Home Depot and IBM clearly did not owe a duty to Warnick, it is also important to note that the imposition of a duty on Home Depot or IBM in this situation would go against public policy.

First, it would go against public policy to hold that IBM or Home Depot "retained control" simply because of the safety measures they took.  If a landowner or general contractor knows about a subcontractor's employee performing an activity unsafely, the landowner or general contractor should be encouraged to speak up.  If they were deemed to have "retained control" in this situation, then IBM and Home Depot would, in the future, be silent when notified of an unsafe condition, in order to protect themselves.  It is doubtful that Pennsylvania would want to discourage hiring parties from notifying contractors about possible safety violations.

IBM and Home Depot both admitted that if they saw a Datatec employee working unsafely they would have a responsibility to say

32

something.  This responsibility stems from two places.  One, as a matter of common sense and human decency, if they thought that a Datatec worker was being unsafe, they should express their concern for his safety and that of others around him.  Two, as a contractual matter, Datatec explicitly assumed responsibility for the supervision, control, . . . health and safety of [its] Personnel."  If IBM or Home Depot becomes aware of Datatec employees working unsafely, they should notify Datatec because Datatec would be violating its duties under the contract.

Second, to impose a duty on Home Depot based on the "peculiar risk" exception would only serve to encourage contractors and their employees to perform their jobs unsafely. The "peculiar risk" exception should be applied only to those activities that are inherently dangerous, not to those activities that are made dangerous by the contractor's negligence.  If Warnick's argument here were to succeed, "the more negligent that an independent contractor and/or his servants are in performing an ordinary task, the more likely it is that the Peculiar Risk Doctrine should be invoked and the employer of the contractor should be held vicariously liable."  Id. at 1387.  This would indeed be poor public policy.

As a matter of good public policy, Pennsylvania law encourages safe work practices by contractors' employees. Imposition of a duty here on Home Depot or IBM would go against

33

this policy.

d.  <u>Conclusion: Plaintiffs' claims</u>

Thomas Warnick's negligence claims against both Home Depot and IBM cannot survive.  Maureen Warnick's claim against both Home Depot and IBM for loss of consortium is derivative to her husband's claims, and therefore also cannot survive.  Judgment will be entered on behalf of Home Depot as to Count I, IBM as to Count II, and Home Depot and IBM as to Count IV.

2.  <u>Home Depot and IBM's claims against each other</u>

Although the Court has determined that Defendants Home Depot and IBM are entitled to summary judgment on Plaintiffs' claims against them, this case is not yet over.  Home Depot and IBM have cross-claimed against each other.

The crux of the cross-claims is for contribution if judgment in favor of Plaintiff is entered.  In light of the decisions reached here, judgment in favor of Plaintiff will not be entered, and these cross-claims are therefore moot.

However, Home Depot has also asserted two breach of contract claims against IBM.  Home Depot asks for IBM to assume Home Depot's defense and for IBM to reimburse Home Depot for all expenses incurred in this litigation.  The former request is moot, as the case with respect to Plaintiff is now moot.  The only remaining question is whether, under the terms of the

34

agreement between them, IBM is liable to Home Depot for Home Depot's costs in this litigation.

Home Depot issued a Notice of Request for Proposal for Store Technology Enhancement Plan (RFP), dated May 14, 2002, in which it "invite[d] prospective contractors to submit a written proposal."  Doc. No. 29, Ex. F, at i-ii.  The RFP was never signed by IBM.  IBM then submitted a Compliant Data Infrastructure and Vendor Project Management of STEP Statement of Work (SOW), dated August 1, 2002, which "represent[ed] IBM's understanding of [Home Depot's] requirements as stated in [Home Depot's] RFP and subsequent discussions."  Doc. No. 29, Ex. G, at i, 1.  The SOW was signed by both parties on July 26, 2002.[13]  Id. at 35.  Immediately above the signatures on the SOW was the following provision: "Each of us agrees that the complete agreement between us about these Services consists of 1) this Statement of Work, including authorized Project Change Requests and 2) the IBM International Customer Agreement."[14]  Id.

The dispute between Home Depot and IBM hinges on whether the RFP was incorporated into the subsequent contract between Home

---

[13] It is unclear how the SOW was executed six days before it was issued.

[14] The IBM International Customer Agreement (ICA) referenced in the SOW was executed on September 27, 1999.  Doc. No. 29, Ex. H, at 1.  It "covers business transactions [Home Depot] may wish to do with [IBM] to purchase Machines, license Programs, and acquire Services."  Id.

Depot and IBM.  The RFP stated that the winning bidder would indemnify and defend Home Depot in any action arising out of the work and that the winning bidder would also maintain an insurance policy naming Home Depot as an additional insured.  Doc. No. 29, Ex. F, App. A, §§ 7.1, 7.3(b).  Therefore, if the RFP <u>is</u> part of the contract, then Home Depot is entitled to judgment as a matter of law; on the other hand, if the RFP is <u>not</u> part of the contract, then IBM is entitled to judgment as a matter of law.

Under New York law,[15] "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms."  <u>W.W.W. Assocs., Inc. v. Giancontieri</u>, 566 N.E.2d 639, 642 (N.Y. 1990).  "The interpretation of the terms of a written agreement that are clear and unambiguous is a matter of law for the court, and the court should construe the words and phrases used according to their plain meaning."  <u>Russack v. Weinstein</u>, 737 N.Y.S.2d 638, 640 (App. Div. 2002).

The SOW contains a merger or integration clause, which provides that the whole of the agreement between the parties is embodied in the contract at hand, to the exclusion of all other alleged agreements.  <u>See generally</u> 11 <u>Williston on Contracts</u> §

---

[15] The ICA provides that New York State law governs the agreement.  ICA at 31.  Neither party argues that the Court should apply another state's law, so this Court will apply New York law.

33:21 (4th ed.).  "A completely integrated contract precludes extrinsic proof to add to or vary its terms."  Primex Int'l Corp. v. Wal-Mart Stores, Inc., 679 N.E.2d 624, 627 (N.Y. 1997). "[A]bsent fraud or mutual mistake, where the parties have reduced their agreement to an integrated writing, the parol evidence rule operates to exclude evidence of all prior or contemporaneous negotiations between the parties offered to contradict or modify the terms of their writing."  Marine Midland Bank-Southern v. Thurlow, 425 N.E.2d 805, 807 (N.Y. 1981).

Home Depot has put forth no evidence of fraud or mutual mistake.  Rather, it relies on the SOW's statement that the SOW represents "IBM's understanding of [Home Depot's] requirements as stated in [Home Depot's] RFP."  The RFP is not incorporated or integrated into the SOW.  Indeed, the SOW's integration clause provides that the "complete agreement" between the parties consists of only two documents: the SOW and the ICA.  By the SOW's own terms, the RFP was not incorporated into the agreement between the parties.  Consideration of terms outside the SOW or ICA is barred by the parole evidence rule.  In other words, the contract speaks for itself, and it does not contain the indemnification or defense clause asserted by Home Depot.

Therefore, Home Depot's claim against IBM for IBM to reimburse Home Depot for the costs of its defense in this suit is without merit.  IBM is entitled to summary judgment on this

37

claim.[16]


III.  CONCLUSION

Thomas Warnick's claims for negligence against Home Depot (Count I) and IBM (Count II) cannot, as a matter of law, proceed. Maureen Warnick's claim for loss of consortium, which is derivative of her husband's negligence claims, also, as a matter of law, cannot proceed.  Therefore, Home Depot and IBM are entitled to summary judgment on Plaintiffs' claims against them.

The contract between Home Depot and IBM does not contain a provision whereby IBM is required to provide for Home Depot's defense in a suit arising from Home Depot's alleged negligence. Therefore, IBM is entitled to summary judgment on Home Depot's claims against it.

An appropriate Order follows.

---

[16] Although IBM did not make a formal motion for summary judgment against Home Depot, it is entitled to summary judgment. See infra note 3.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
THOMAS WARNICK and          :
MAUREEN WARNICK,            :       CIVIL ACTION
                            :
          Plaintiffs,       :       NO. 05-2529
                            :
     v.                     :
                            :
THE HOME DEPOT U.S.A., INC.,:
et al.,                     :
                            :
          Defendants.       :
```

ORDER

**AND NOW**, this **10th** day of **May 2007**, for the reasons stated in the accompanying Memorandum, it is hereby **ORDERED** that Defendant Home Depot's motion for summary judgment against Plaintiffs (doc. no. 29) is **GRANTED**.  Home Depot is granted summary judgment on Plaintiffs' remaining counts against it, Counts I and IV.

**IT IS FURTHER ORDERED** that Defendant IBM's motion for summary judgment against Plaintiffs (doc. no. 32) is **GRANTED**. IBM is granted summary judgment on Plaintiffs remaining counts against it, Counts II and IV.

**IT IS FURTHER ORDERED** that Defendant Home Depot's motion for summary judgment against Defendant IBM on Home Depot's cross-claims (doc. no. 29) is **DENIED IN PART** and **DENIED AS MOOT IN PART**.  The motion is denied as moot as to Count I and the motion

39

is denied as to Counts II and III.

**IT IS FURTHER ORDERED** that Defendant Home Depot's motion for summary judgment against Defendant IBM on IBM's cross-claim (doc. no. 29) is **DENIED AS MOOT.**

**IT IS FURTHER ORDERED** that Defendant IBM's motion for summary judgment against Defendant Home Depot on Home Depot's cross-claims (doc. no. 31, construed by the Court as a motion for summary judgment against Home Depot) is **DENIED AS MOOT IN PART** and **GRANTED IN PART.**  The motion is denied as moot as to Count I and the motion is granted as to Counts II and III.

**IT IS FURTHER ORDERED** that Defendant IBM's motion for summary judgment against Defendant Home Depot on IBM's cross-claim (doc. no. 31, construed by the Court as a motion for summary judgment against Home Depot) is **DENIED AS MOOT.**


**AND IT IS SO ORDERED.**


S/Eduardo C. Robreno

**EDUARDO C. ROBRENO, J.**